# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 13-02134-TLM |
| TOM A. FLOYD and | ) | |
| EVELYN L. FLOYD, | ) | |
| | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JEREMY GUGINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 14-06008-TLM |
| | ) | |
| KEVIN ROWLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Tom Floyd ("Floyd") and Evelyn Floyd (collectively "Debtors") filed a joint voluntary chapter 7 petition on October 18, 2013.[1] On February 21, 2014, the chapter 7 trustee, Jeremy Gugino ("Trustee"), filed the complaint initiating this adversary proceeding against Kevin Rowley ("Defendant"), and on July 24, 2014,

_____

[1] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–1532. Citations to "Rules" are to the Federal Rules of Bankruptcy Procedure.

filed an amended complaint, Adv. Doc. No. 10 ("Complaint").  Trustee's

Complaint seeks recovery from Defendant on several theories, certain of which are

pleaded in the alternative.  Defendant answered the Complaint and the cause was

tried on August 12, 2015.  Floyd and Defendant were the only witnesses.  Exhibits

were admitted by stipulation.  *See* Adv. Doc. No. 22 (minute entry).  This Decision

constitutes the Court's findings of fact and conclusions of law.  Rule 7052.

**JURISDICTION**

The Complaint asserts jurisdiction exists under 28 U.S.C. §§ 1334 and 157.

Trustee alleges that the claims pursued in this matter are core proceedings,

however "[t]o the extent any portion of the claims . . . is determined by the court to

be a non-core proceeding, or an unconstitutionally core proceeding, the Trustee

expressly consents to this Court's entry of final orders in this matter."  Adv. Doc.

No. 10 at 2, ¶¶ 3–5.  Defendant's answer to the Complaint admits those

paragraphs.  *See* Adv. Doc. No. 11 at 2.  Further, Defendant "expressly consents to

this Court's entry of final orders in this case."  *Id.*[2]

**FACTS**

Debtors are the sole members of Action AG, LLC ("Action AG"), an Idaho

limited liability company that filed its own chapter 7 case three days before

---

[2]  *See Wellness Int'l Network, Ltd. v. Sharif*, __ U.S. __, 135 S.Ct. 1932, 1947–48 (2015)
(recognizing express and implied consent).

MEMORANDUM OF DECISION - 2

Debtors filed.[3]  Action AG was engaged in farming and commodity trading involving alfalfa hay, grain, barley, corn and beans.  Action AG purchased crops (corn, wheat, hay, etc.) from Defendant starting in 2009.  And Defendant also performed some combine work and custom baling of corn stalks for Action AG in 2010.  As a result, by late 2012 Action AG owed Defendant substantial amounts.  By then, Defendant had ceased doing business with Action AG and was making efforts, including repeated contact with Floyd, to obtain payment of Action AG's debt.

Floyd mailed letters to Action AG's creditors in late 2012 in an attempt to negotiate on the entity's outstanding debts.[4]  At roughly the same time, Defendant's farm lender informed Defendant that it would cease providing him operating financing because Defendant had such a large uncollected receivable from Action AG.  The lender indicated that, in order to retain financing, Defendant had to get some sort of payment from Action AG to reduce the debt or a personal guarantee of the debt from Floyd.

On December 14, 2012, Floyd executed a personal guarantee of "all monies owed by Action AG" to Defendant for 2011 wheat, 2011 corn and corn stalk

---

[3]  *See* Case No. 13-02107-TLM.  That case was closed as a no-asset chapter 7 on November 3, 2014.

[4]  The letters were not introduced.  Floyd testified that the letters essentially told creditors that Action AG could not timely pay obligations because of issues with a corn crop lawsuit and lack of cash flow, but it was willing to make arrangements including "trading" some equipment.

MEMORANDUM OF DECISION - 3

baling, and 2012 corn.  Ex. 100.

On January 25, 2013, Action AG executed a "note" payable to Defendant in the total amount of $135,000, payable at $13,500 per year plus 6% interest commencing February 1, 2014.  Ex. 101 (the "Note").  The Note acknowledged that Action AG gave Defendant a "lien" on 21 titled vehicles (trucks and trailers). It stated: "Kevin Rowley to be title lien holder on titles and keep titles until paid in full.  Upon full payment Kevin Rowley agrees to sign off titles and give titles back to Action AG, LLC."

Also on January 25, 2013, Defendant and Action AG entered into a "trade/note."  Ex. 102 (the "Trade Note").  It reflects that Action AG owed Defendant for 2011 and 2012 wheat, 2011 corn, and custom farm work, all totaling $210,000.  To satisfy this obligation, Defendant agreed to take as partial payment certain real property located at 5426 Hwy. 95, New Meadows, Idaho with an ascribed value of $75,000.[5]  Defendant was also given liens on 21 titled vehicles, which were the same vehicles as itemized in the Note.[6]  Defendant testified that Floyd realized "trading off" the equipment would effectively end Action AG and, therefore, they used the "lien" alternative.

---

[5]  This property is approximately 3/4 of an acre located half way between New Meadows and Riggins, Idaho.  There is a 24' x 36' cabin/shop located on the parcel, which has no water or well.  It is used as an RV camping site.

[6]  The listing of the vehicles' values in the Note totaled $135,000.  The listing of the same in the Trade Note (*i.e.*, $135,000) plus the $75,000 attributed to the real estate, equaled the $210,000 obligation amount shown in that Trade Note.

MEMORANDUM OF DECISION - 4

Among the listed vehicles in the Note and Trade Note was a 2005 GMC pickup truck (VIN ending ***69852) valued at $10,000.  Exs. 101, 102.  The GMC, however, was not owned by Action AG.  It was owned by Debtors.  On January 30, 2013, a certificate of title was issued on the GMC showing Debtors' ownership and a lien recorded in favor of Defendant.  Ex. 103.

According to Debtors' statement of financial affairs, they paid Defendant $500 "each month" for the "purchase" of the GMC truck, and the amount of $1,500 is shown as having been paid in the three months prior to filing.  Ex. 108 at 35.  Though testimony was unclear, it appears this payment allowed Debtors to keep and use the truck that was still titled in Debtors' name but subject to Defendant's recorded lien.  Ex. 103.

On January 31, 2013, a warranty deed was recorded in Adams County, Idaho, transferring to Defendant the New Meadows property referred to in the Trade Note.  Ex. 104.  The grantors of that deed were Debtors personally.

After these January 2013 transactions, Defendant's phone calls to Floyd ceased because Defendant had obtained the relief necessary to assuage his own farm lender and because the first payment under the Note would come due a year later in February 2014.  Floyd testified that the agreements also achieved his own goals of salvaging a working relationship between Action AG and Defendant, and gaining time to rehabilitate Action AG's business.

Action AG was not able to obtain financing in the spring of 2013 sufficient

MEMORANDUM OF DECISION - 5

to farm land it had leased, so it subleased that land to Defendant to farm.
Defendant subsequently employed Floyd to do some of the farm labor required on
that leased ground.

During Debtors' bankruptcy, Defendant purchased from the chapter 7
Trustee certain of Debtors' business interests in other entities. *See* Doc. No. 102
(notice of auction sale of Debtors' interests in Action Milling, Inc., Action AG
Transport, LLC, and Western States Dust Control, LLC, with opening bid from
Defendant); Doc. No. 120 (report of sale of same to Defendant for $30,000). After
acquiring Action AG Transportation, Defendant hired Floyd as a manager of that
business from May 2013 until May 2015. Defendant also employed Mrs. Floyd to
do some part time work for one or two of his companies.

A.     **Solvency at transfer**

Certain of the causes of action require analysis of Debtors' solvency at the
time of the challenged transfers. The evidence establishes that, in late 2012 and
early 2013, Debtors' liabilities significantly outweighed their assets.[7] Debtors had
some equity in their personal home (all of which was claimed as exempt) and
minimal equity in their personal vehicles. A few of their business interests had
some modest value, but Debtors' liabilities in January 2013 exceeded the

_____

[7] Trustee's counsel led Floyd through an analysis of Debtors' October 2013 schedules A
and B, *see* Ex. 108, and November 2013 amended schedules, *see* Ex. 109. Counsel elicited
testimony from Floyd as to any changes or differences in assets or asset values, and in liabilities,
between December 2012 and January 2013 and the filing of the petition in October 2013.

MEMORANDUM OF DECISION - 6

aggregate value of all their assets.  Debtors were at that time insolvent.  *See*

§ 101(32)(A) (defining insolvent as a "financial condition such that the sum of

such entity's debts is greater than all of such entity's property, at a fair valuation"

exclusive of certain property transferred and property that may be claimed

exempt).

**DISCUSSION AND DISPOSITION**

> **A.    Contentions**

Trustee asserts several claims.  He contends:

1.    The guarantee of Action AG's obligation to Defendant lacked

consideration and is therefore void.  Alternatively, if the guarantee is valid, the

transfers of Debtors' property (the lien in the GMC and the deed to the New

Meadows property) constitute preferences avoidable under § 547(b).  Because

those transfers occurred more than 90 days before bankruptcy, Trustee alleges

that, under the evidence, Defendant was a "non-statutory insider" allowing

transfers within one year of the petition to be avoided.

2.    The transfer of the title to the GMC, and the transfer of the warranty

deed on the New Meadows real property, are fraudulent transfers avoidable under

§ 548(a)(1)(B) because they were made while Debtors were insolvent, Debtors

received less than reasonably equivalent value, and the transfers occurred within

one year of bankruptcy.

3.    These same transfers are avoidable as fraudulent transfers under

MEMORANDUM OF DECISION - 7

§ 544(b) and Idaho Code § 55–913, *et seq*.

4.      The lien on the GMC is avoidable under § 544 because Debtors did not individually sign the Note or the Trade Note (only Action AG did), and thus there is no security agreement granting a lien to Defendant notwithstanding his purported perfection of one on the certificate of title.

5.      If the lien on the GMC is avoidable, any $500.00/month payments made by Debtors to Defendant subsequent to the petition date "in an amount to be proved at trial" are recoverable.

*See* Adv. Doc. No. 10.

### B.      Validity of guarantee

Trustee's argument posits that a guarantee is a contract, that contracts must be supported by consideration, and that Debtors received nothing of value from Defendant for the guarantee.[8]  The guarantee was in writing and executed by Floyd.  Ex. 100.  A presumption arises from a written instrument that consideration has been given and, once the presumption arises, the party seeking to assert a lack of consideration must prove that assertion by a preponderance of the evidence.  *Rakozy v. Murphy (In re Ace Mfg. & Supply, Inc.)*, 1995 WL 106840, *3 (Bankr. D. Idaho Mar. 13, 1995) (citing *W.L. Scott, Inc. v. Madras Aerotech, Inc.*, 653 P.2d 791, 796 (Idaho 1982)).

---

[8]  The case law cited in Trustee's brief is not particularly helpful as it is generic and not related specifically to guarantees.

MEMORANDUM OF DECISION - 8

"To constitute consideration, a performance or a return promise must be bargained for.  A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Boise Tower Assocs., LLC v. Hogland*, 215 P.3d 494, 500 (Idaho 2009) (quoting Restatement (Second) of Contracts § 71 (1981)). Courts "will not inquire as to the adequacy of consideration as bargained for by [the] parties to an agreement." *Id.* (citing *Vance v. Connell*, 529 P.2d 1289, 1291 (Idaho 1974).

The Idaho Supreme Court addressed the question of adequacy of consideration in *Sirius LC v. Erickson*, 244 P.3d 224 (Idaho 2010).  The court cited *Boise Tower* and noted there were only limited exceptions to the principle addressed in the Restatement (Second) of Contracts § 79 dealing with adequacy of consideration and mutuality of obligation.  *Id.* at 229–30.  That section of the Restatement provides an illustration, apropos to the present litigation: "A contracts to sell property to B.  As a favor to B, who is C's friend, and in consideration of A's performance of the contract, C guarantees that B will pay the agreed price. A's performance is consideration for C's promise."  Restatement (Second) of Contracts § 79 cmt. b (1981).

In addition the Idaho Court of Appeals held that, in an otherwise valid

MEMORANDUM OF DECISION - 9

guaranty agreement,[9] "the extension of credit to a debtor is deemed sufficient consideration for the guarantor" of that debtor's obligation. *Gulf Chems. Emps. Fed. Credit Union v. Williams*, 693 P.2d 1092, 1096 (Idaho Ct. App. 1984) (citing *Bank of Idaho v. Colley*, 647 P.2d 776 (Idaho Ct. App. 1982)). In *Colley*, the court considered a case where a bank loan went into default, and the bank sued a guarantor on the obligation. The court held:

> Christopherson [the guarantor] contends that the guaranty should fail for lack of consideration, because he received no compensation for guaranteeing payment of the debt. This sweeping contention would eliminate entirely any obligation of a gratuitous guarantor or surety. We reject it.
>
> A guaranty is deemed to be supported by consideration if a benefit to the principal debtor, or detriment to the creditor, is shown. *E.g.*, *Southdale Center, Inc. v. Lewis*, 260 Minn. 430, 110 N.W.2d 857 (1961). This general rule has a statutory parallel in the Idaho Uniform Commercial Code, which provides that an "accommodation party" (surety or guarantor) to a negotiable instrument, such as a promissory note, is liable to the promisee if the debtor receives value for the instrument. *See* I.C. § 28–3–415, comments 1 and 3. In the instant case, it is undisputed that the debtor received $20,000 from the bank. We conclude that Christopherson's guaranty was supported by consideration.

*Id.* at 781–82.[10]

---

[9]  Validity requires, for example, that the agreement be in writing in order to meet the statute of frauds. *See Mickelsen Constr., Inc. v. Horrocks*, 299 P.3d 203, 207–08 (Idaho 2013) (citing Idaho Code § 9–505(2)).

[10]  Trustee emphasizes that no [direct] benefit flowed to Floyd in making the guarantee. *Horrocks*, however, answers that contention. "[A]dequate consideration to support a contract does not have to be a gain by the promisor; it can be a loss by the promisee." 299 P.3d at 210. Further: "To constitute a consideration it is not absolutely necessary that a benefit should accrue to the person making the promise. It is sufficient that something valuable flows from the person
(continued...)

MEMORANDUM OF DECISION - 10

Trustee's lack of consideration argument lacks merit. Floyd's guarantee of

Action AG's obligations is valid. In this regard, the Complaint will be dismissed.

## C.    Preference

Trustee contends that, should the guarantee be held valid (as it now has),

then the transfers at issue constitute preferences avoidable under § 547(b). Trustee

views the same as transfers by Debtors to or for the benefit of Defendant as a

creditor, for or on account of an antecedent debt owed Defendant before the

transfer, made while Debtors were insolvent, which allowed Defendant to receive

more than he would in Debtors' chapter 7 case in the absence of such payment.

*See* § 547(b)(1), (2), (3) and (5). But, because the transfers at issue occurred in

January 2013 and the bankruptcy petition was filed on October 18, 2013, and

given § 547(b)(4)(A)'s limitation to transfers within 90 days of bankruptcy, this

contention fails unless the Court determines Defendant was an "insider" of

Debtors. *See* § 547(b)(4)(B) (providing for avoidance of transfers between 90

days and one year prior to filing for a creditor who is an insider).

On the evidentiary record presented, Defendant does not qualify as an

insider under the definition found in § 101(31)(A). Trustee therefore argues that

Defendant is, instead, a "non-statutory insider."

As stated in *Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman)*, 126

---

[10] (...continued)
to whom it is made; and that promise is the inducement to the transaction." *Id.* (quoting *Violett v. Patton*, 9 U.S. 142, 150, 3 L.Ed. 61 (1809)).

B.R. 63, 70 (9th Cir. BAP 1991):

> The case law that has developed . . . indicates that not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship.
>
> A common basis for these rulings was the perception that, while a creditor may be in a strong bargaining position in dealing with the debtor, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status even though there was some degree of personal relationship with the debtor. It is unlikely that Congress intended that complex business relationships existing over a period of time, attended by some personal involvement but without control by the creditor over the debtor's business, would subject such creditor to insider status.

*Id.* at 70 (citations omitted).  This approach continues to be followed in this Circuit.  *Gladstone v. Schaefer (In re UC Lofts on 4th, LLC)*, 2015 WL 5209252, *19–20 (9th Cir. BAP Sept. 4, 2015);  *The Vill. at Lakeridge, LLC v. U.S. Bank, Nat'l Ass'n (In re the Vill. at Lakeridge, LLC)*, 2013 WL 1397447, *5 (9th Cir. BAP Apr. 5, 2013) (citing *Friedman*).[11]  Among other things, courts look to the "closeness of the parties, and the degree to which the [creditor] is able to exert control or influence over the debtor."  *Gladstone*, 2015 WL 5209252, at *20 (also noting "The primary test of a non-statutory insider is whether the creditor 'exercises such control or influence over the debtor as to render their transaction not arms-length.'" (citations omitted)).

---

[11] *Friedman* has also been followed and its test applied in this court.  *Elsaesser v. Cougar Crest Lodge, LLC (In re Weddle)*, 353 B.R. 892, 899–900 (Bankr. D. Idaho 2006).  *See also Rainsdon v. Farson (In re Farson)*, 387 B.R. 784, 792–94 (Bankr. D. Idaho 2008) (discussing this test and cases that did, and did not, find non-statutory insider status).

MEMORANDUM OF DECISION - 12

The Court finds and concludes that the various interactions between

Debtors and Defendant, as established by the evidence and summarized earlier in

this Decision, do not rise to the level required to determine Defendant is a non-

statutory insider.  In reaching this conclusion, the Court has considered the

testimony of Floyd and Defendant, including their demeanor and credibility.

Neither of them had any reticence in answering counsels' questions about the

various interactions and dealings between them, and did not quibble or dissemble.

There was clearly an ongoing business relationship between them, with several

facets.[12]  But the evidence did not show that Defendant could exert control

because of that relationship, so that the transaction at issue was other than at arms'

length.  The Court holds that Trustee has failed to carry his burden, and the cause

of action premised on § 547(b) will be dismissed.

### D.    Avoidance of lien

Trustee argues the lien obtained by Defendant in the GMC pickup truck is

avoidable under his § 544(a) powers.  Conceding as he must that the lien was

perfected by notation on the certificate of title, Trustee nonetheless argues that a

properly created security interest is lacking.

"The nature and extent of security interests are determined by state law."

*In re Seibold*, 351 B.R. 741, 744–45 (Bankr. D. Idaho 2006) (citing *Philip Morris*

---

[12]  There also was a modest personal relationship, with a few shared meals and attendance at a basketball game.

MEMORANDUM OF DECISION - 13

*Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 502 (9th Cir. 1991)).  In Idaho, the creation and attachment of a security interest is governed by Article 9 of the Uniform Commercial Code, and perfection of that interest in motor vehicles is governed by Idaho Code §§ 49–501–530.  *Id*.

Under Idaho Code § 28–9–203(b), a security interest attaches to collateral and becomes enforceable when value has been given, the debtor has rights in the collateral, and the debtor has authenticated a security agreement that provides a description of the collateral.[13]  "Authentication" means either "to sign" or to "otherwise adopt a symbol, or encrypt, or similarly process a record."  *Seibold*, 352 B.R. at 745 (citing Idaho Code § 28–9–102(a)(7)(B)).  A "security agreement" is an agreement that "creates or provides for" a security interest.  *Id.* (citing Idaho Code § 28–9–102(73), now defined in § 28–9–102(74)).

> [N]o magic words are necessary to create a security interest and . . . the agreement itself need not even contain the term 'security interest.'  This is in keeping with the policy of the [UCC] that form should not prevail over substance and that, whenever possible, effect should be given to the parties' intent.

*Simplot v. William C. Owens, M.D., P.A.*, 805 P.2d 449, 451–52 (Idaho 1990) (quoting *Idaho Bank & Trust Co. v. Cargill*, 665 P.2d 1093, 1097 (Idaho Ct. App. 1983)).

This Court has noted that "agreement" is defined in Article 9 as "the

---

[13]  *See* Idaho Code § 28–9–203(b)(1), (2) and (3)(A).  Idaho Code § 28–9–203(b)(3)(B)–(D) are not applicable here.

MEMORANDUM OF DECISION - 14

bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." *Owen v. Lundstrom (In re Owen)*, 349 B.R. 66, 70 (Bankr. D. Idaho 2006) (citing Idaho Code § 28–1–201(b)(3)). The question in *Owen* was whether certificates of title, signed by the debtor and given to the creditor, and on which the creditor inserted her name as lienholder and then took them to the County's department of motor vehicles and applied for new titles so naming her as lienholder, were sufficient to constitute an authenticated security agreement. The Court held that though the debtor-signed certificates were ambiguous, the balance of the evidence supported the conclusion that they satisfied the minimal requirements of Idaho Code § 28–9–203. *Id.* at 70–72. This, the Court found, was consistent with *Simplot*'s emphasis on intent. *Id.* at 71.[14] And it was also found consistent with treatise authority emphasizing that § 9–203 "merely contemplates *objective indicia of the possibility* of an underlying actual agreement" and that, "in problem cases, the writing may barely meet the objective test, leaving for further factual inquiry the question whether the parties also actually intended to create a security interest." *Id.* (citing James J. White et al., White & Summers, Uniform Commercial Code, § 31–3 (5th ed. 2002)).

    In finding no enforceable security agreement, the Court in *Seibold* stated:

---

[14] *Simplot* stated that "the principal test" is whether "the transaction [is] *intended* to have effect as security." 805 P.2d at 451 (citation omitted).

MEMORANDUM OF DECISION - 15

> Here, no written security agreement in any form was ever authenticated by Debtor.  Indeed, there was no writing produced, *not even* a bill of sale or *an application for a certificate of title, evidencing the parties' intent to create a secured interest* in Mr. Olsen's favor. Absent a writing *or some other record* constituting an authenticated security agreement, Idaho Code § 28–9–203(b) is not satisfied, and no enforceable security interest was created.

351 B.R. at 745–46 (emphasis added).  The emphasized portion of this holding is

what distinguishes the result in *Seibold* from that in *Owen* and in the present case.

Both the Note and the Trade Note were executed by Floyd on behalf of

Action AG.  But it is also clear that Floyd was aware the GMC was owned by

Debtors personally and not by the LLC.  The evidence, written and parol, indicates

he had the intent of providing a security interest in the GMC to Defendant.  And

that intent was promptly effected, as the certificate of title on the GMC showing

Defendant's lien was issued only five days later.  Given that the title now shows a

lien to the benefit of Defendant, it appears that Debtors must have executed

("authenticated") a document that evidences their intent to create a lien, especially

when considered in addition with the other evidence of record.[15]

The whole of the evidence establishes compliance with Idaho Code

---

[15]  *See Gugino v. Credit Acceptance Corp. (In re Conklin)*, 511 B.R. 688, 692–93 (Bankr. D. Idaho 2014) (addressing Idaho requirements, including those under Idaho Code § 49–510, for the obtaining of a perfected lien on a certificate of title, including what the lienholder must show and provide to obtain the department's issuance of a new certificate of title reflecting his lien). *See also* http://adminrules.idaho.gov/rules/2012/39/0205.pdf at IDAPA 39.02.05.100 (Idaho Transportation Department rules governing lien filing on certificate of title).  The application for certificate of title in Idaho requires a signature of the owner(s) of record under a certification stating, in pertinent part: "I, the undersigned, certify that the vehicle/vessel described above is owned by me and this vehicle/vessel will not be the subject of a lien prior to receipt of the title unless indicated in section 3." *See* Idaho Transportation Department Form 3337, http://www.itd.idaho.gov/dmv/VehicleServices/documents/3337.pdf (last visited Nov. 6, 2015).

MEMORANDUM OF DECISION - 16

requirements as construed by the Idaho courts. Trustee's § 544(a) contentions fail, and the Complaint will in such regards be dismissed.

### E.    Fraudulent transfers

Trustee contends the transfer of the New Meadows property and the security interest in the GMC are avoidable under § 548(a)(1)(B).[16]

To establish a constructively fraudulent transfer under § 548(a)(1)(B), Trustee must establish by a preponderance of the evidence (1) a transfer of Debtors' property or Debtors' incurrence of an obligation within two years of the filing of their bankruptcy petition; (2) Debtors received less than reasonably equivalent value in exchange for the transfer or obligation; and (3) Debtors were insolvent on the date of the transfer or obligation, or the transfer or obligation caused Debtors to become insolvent. *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 440 (Bankr. D. Idaho 2008); *see also Gugino v. Ortega (In re Pierce)*, 428 B.R. 524, 528–29 (Bankr. D. Idaho 2010) (citing *Jordan* and *Decker v. Advantage Fund Ltd.*, 362 F.3d 593, 596 (9th Cir. 2004)). The dates of the challenged transfers fall within the statutory parameter. Debtors' insolvency on such dates has already been found. Only the third element is at issue.

---

[16]  Trustee also argues they are fraudulent transfers under Idaho Code § 55–913 made applicable through his § 544(b) powers. The differences between § 548(a)(1)(B) and use of state law under § 544(b) effectively relate to a 4 year look-back period under the latter, as opposed to the two year period under § 548(a). The guarantee was made in December 2012 and the transfers of the real estate and security interest in the vehicle occurred in January 2013. The bankruptcy petition was filed on October 18, 2013. Trustee has not explained why recourse to § 544(b) is of any utility or makes any sense in this case, and it will not be further discussed.

MEMORANDUM OF DECISION - 17

To determine whether Debtors received less than reasonably equivalent value, the Court must determine (a) whether Debtors received value and (b) whether that value was "reasonably equivalent" to what they gave up. *Jordan*, 392 B.R. at 441.[17]  "In order to determine whether a fair economic exchange has occurred, the court must analyze all the circumstances surrounding the transfer in question." *Id.* (citing 5 Collier on Bankruptcy ¶ 548.05[1][b] at 548–35 (Alan N. Resnick & Henry J. Sommer eds., rev. 15th ed. 2007)).  Value includes, under the language of § 548(d)(2)(A), "property, or satisfaction or securing of a present or antecedent debt of the debtor[.]"  "A transfer is for value if one is the quid pro quo for the other." *Jordan*, 392 B.R. at 441.

As described more fully in *Jordan*, reasonable equivalence is measured as of the time of the transfer. *See also Pierce*, 428 B.R. at 530.  It is analyzed from the point of view of the debtors' creditors.  Reasonable equivalence does not require exact equality of value, but rather must be approximately or roughly equivalent, and is fundamentally a question of common sense. *Jordan*, 392 B.R. at 441–42.  However, "[t]he common thread expressed in the case law instructs that the Court must have a quantifiable basis for its valuation, although the information available to the Court need not be precise." *Pierce*, 428 B.R. at 530. The Court needs at least "some rough or approximate understanding of the

---

[17]  *See also Gugino v. Kerstein (In re Miller)*, 536 B.R. 863, 870–71 (Bankr. D. Idaho 2015); *Hopkins v. Crystal 2G Ranch, Inc. (In re Crystal)*, 513 B.R. 413, 418–19 (Bankr. D. Idaho 2014).

MEMORANDUM OF DECISION - 18

financial value of the transfer so that it can analyze the effect of avoidance of the transfer on funds available to the debtor's estate." *Id.* at 530–31.

Further, indirect benefits to the debtor, as well as direct benefits, may constitute value if sufficiently concrete and identifiable. "Beyond looking at what is exchanged in a *quid pro quo* transaction, it is important to examine the value of all benefits inuring to a debtor by virtue of the transaction in question, directly or indirectly." *Jordan*, 392 B.R. at 442 (citing *Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 281 (Bankr. D. Idaho 2002)).

Defendant seems to argue Debtors received "indirect benefits" even though Debtors' transfers of the real property and the lien in the GMC resulted primarily in Defendant's forbearance in collection against Action AG. Ultimately, this situation does not fit well into the case law addressing indirect benefits, and runs headlong into case law emphasizing the impact of the transfers on Debtors' estate.

The Ninth Circuit in *Frontier Bank v. Brown (In re N. Merch., Inc.)*, 371 F.3d 1056 (9th Cir. 2004), recognized that "reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule." *Id.* at 1058 (quoting *Harman v. First Am. Bank (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992)). Nevertheless, "the primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors." *Id.* at 1059. In determining whether the debtor received reasonably

MEMORANDUM OF DECISION - 19

equivalent value, "the analysis is directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost." *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991) (internal quotation marks and citations omitted).

The transfers at issue removed $75,000 of value in real estate and $10,000 of equity in the vehicle from Debtors' estate.[18]  In return for these transfers (and for guaranteeing Action AG's debt to Defendant), Debtors received only the ability as Action AG's members to see if that entity's financial situation could be saved.  That was not shown to be reasonably equivalent to the value transferred.

Even acknowledging some indirect benefit to Debtors, the benefit has to be "sufficiently concrete and identifiable" and "reasonably equivalent" from the point of view of Debtors' creditors.  In considering the whole of the evidence, neither aspect of the case law exists here.  Thus, Trustee has established the elements required for avoidance of the transfer under § 548(a)(1)(B) by a preponderance of the evidence.

**CONCLUSION**

While several of Trustee's theories were not meritorious, he did establish the transfers by Debtors of the real estate and the security interest in their vehicle were constructively fraudulent transfers avoidable under § 548(a)(1)(B).  Under

---

[18]  Action AG's transfer of security interests in the other assets listed in the Trade Note are not part of the § 548(a)(1)(B) analysis as to Debtors and their personal estate.

MEMORANDUM OF DECISION - 20

§ 550(a)(1), such property, or its value, is recoverable from Defendant.  Judgment will be entered for Trustee accordingly, and all other counts will be dismissed.

Trustee shall prepare and submit a form of judgment consistent with this Decision.

DATED:  November 10, 2015

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 21